# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

MAY 1 0 2006

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

No. 04-2299

03-5225

| | |
|---|---|
| Gary Bowman, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * Appeal from the United States |
| | * District Court for the Western |
| John A. White, in his official capacity | * District of Arkansas. |
| as Chancellor of the University of | * |
| Arkansas; Donald O. Pederson, in his | * |
| official capacity as Vice Chancellor for | * |
| Finance Administration for the | * |
| University of Arkansas; Larry L. | * |
| Slammons, in his official capacity as | * |
| Director of the University of Arkansas | * |
| Police Department, | * |
| | * |
| Defendants - Appellees. | * |

Submitted: January 14, 2005
Filed: April 14, 2006

Before BYE, MELLOY, and COLLOTON, Circuit Judges.

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

MELLOY, Circuit Judge.

Plaintiff-Appellant Gary Bowman filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 against Defendants-Appellees John A. White, Donald O. Pederson, and Larry L. Slammons as officials representing the University of Arkansas at Fayetteville (collectively hereinafter known as the "University").  Bowman alleges that the University's policy regarding the use of its facilities and space, which contains restrictions on use by non-University entities, unconstitutionally abridges his right to free speech.  Following a plenary hearing on the merits of Bowman's request for injunctive relief, the district court dismissed his complaint with prejudice.  The district court found that the University's campus was a nonpublic forum and that all the challenged restrictions on speech were reasonable.  Bowman now brings this timely appeal.

I.

Gary Bowman is a professing Christian who engages in street preaching about his religious beliefs and convictions as a tenet of his faith.  His message typically concerns sin, repentance and a final judgment.  He states that he shares his message in the hope of securing salvation for his audience.  He employs various means of communication, including the use of signs, public speaking, literature distribution, symbolic speech, and one-on-one conversation.

Bowman particularly wants to share his religious message with college students and others found at public universities because of what he deems to be a moral obligation.  To this end, he preaches at many college campuses, including the University of Arkansas at Fayetteville. Bowman considers the University a uniquely suitable place to communicate his message because of its close proximity to his residence in Oklahoma and the significant number of students that can be found in outdoor areas.

The University is the flagship campus of the University of Arkansas System. It has an enrollment of more than 16,000 students. In an attempt to regulate an ever-increasing demand on the use of its facilities, the University enacted Fayetteville Policies and Procedures 708.0, entitled "Use of University Facilities and Outdoor Space" (the "Policy"). The Policy comprehensively governs the use of University outdoor space.[1] It contains guidelines and procedures for space allocation and reservations. The Policy applies to all areas within the University's direct control, including its streets, sidewalks, and parks.

The Policy distinguishes between University Entities and Non-University Entities. Under the Policy, Bowman is classified as a Non-University Entity.[2] The Policy places a five-day cap per semester per entity on the use of facilities and outdoor space by Non-University Entities. In addition to the five-day cap, the Policy requires Non-University Entities to make reservations in advance of their use of a space. A reservation allows a Non-University Entity to use the outdoor space for one eight-hour day. A reservation is required regardless of the use that will be made of the space, whether that use be speaking, carrying signs, handing out literature, or sitting silently. The Policy does not, however, regulate one-on-one conversations. The Policy also imposes a three-business-day advance notice requirement for the use of space by Non-University Entities. The Policy prohibits a Non-University Entity's use of space from interfering with the educational mission of the University and allows the University to cancel or modify a space reservation in the event that a use does interfere. The Policy further prohibits the use of space by Non-University Entities during so called

---

[1] Use of indoor space is governed by individual use policies which are not at issue in this case.

[2] It should be noted, however, that on one occasion Bowman was able to obtain sponsorship from a student organization which allowed him to reserve space as a University Entity.

-3-

"dead days," which consist of one quiet study day per semester, all final exam periods, and dates of commencement activities.

In the fall of 1998, Bowman obtained permits to appear twice on campus for speaking purposes. Bowman returned to the University in the fall of 2000, at which time he complained to University officials that the permit requirement was imposing a significant restraint on his speech. According to Bowman, it was more difficult for him to plan the days he wished to speak in advance because he could not determine with any certainty his future work schedule or whether a noteworthy event would prompt him to want to speak on a certain day.

To alleviate these concerns, the University granted Bowman blanket permission to appear on campus and communicate his message during the fall semester. With the blanket permission in place, Bowman spoke approximately twenty times in the fall of 2000. Despite having blanket permission to speak on campus, Bowman discovered he needed a permit for any other form of expression. Bowman was not permitted to hand out literature, use signs, or engage in symbolic protests without first obtaining a permit.

Bowman often used inflammatory language and tactics in his presentations, the nature of which were considered highly offensive by many students. During the fall semester of 2000, several students and faculty members complained of Bowman's presence on campus. Campus police, in response to these complaints, occasionally had to curb violent outbursts and erect barricades to maintain crowd control as Bowman sometimes drew crowds as large as 200 people.

In the spring semester of 2001, the University denied Bowman blanket permission to speak. As a result, Bowman submitted individual requests for permits to speak on selected days. By letter, the University advised Bowman that it would only consider up to three separate space reservation forms at any one time. The letter

-4-

further indicated that the campus speech policies "are currently under review and are likely to be revised in the future." That semester, Bowman was denied permission to speak on the University's dead days.

For the next fall, Bowman planned a series of presentations entitled "Ten Commandments," which was to be part of a larger series entitled "Forty Things Every Student Needs to Know." During each campus visit, he anticipated covering one Commandment and one "Thing Every Student Needs to Know." Bowman applied for individual permits to cover each of the first six Commandments.

In the meantime, the University formally revised the Policy to its current form. By letter dated August 21, 2001, the University informed Bowman of the revisions and approved, in part, his request for use of the grounds by granting him three days in which to present his message. Bowman, in a letter outlining his concerns regarding the Policy, subsequently requested an additional seven days. The University, citing its new five-day cap, denied Bowman a permit for the additional seven days. Bowman resubmitted his permit application, requesting an additional three days, for a total of six days. The University granted him permission for two days, but denied permission for the third day, citing the five-day cap. Bowman proceeded with his speech on the days he was allowed to speak, covering the first five Commandments. Due to the five-day cap, Bowman was precluded from sharing his message for the rest of the fall semester of 2001.

During the spring semester of 2002, Bowman once again utilized his five permitted days. Bowman applied for a sixth visit. His request was denied under the five-day cap.

Later that spring, with the sponsorship of a student organization, Bowman attempted again to speak on a sixth day. The University approved the appearance, but required a representative of the student organization to be with Bowman at all times

while Bowman remained on campus.  Bowman was forced to cease his expression whenever the representative was not present.

Unable to resolve his differences with the University, Bowman filed the present lawsuit alleging that the permit requirement, five-day cap, three-day advance notice requirement, and dead day ban are unconstitutionally vague, overbroad, and discriminatory as applied to him, in violation of the First and Fourteenth Amendments to the United States Constitution.  He sought declaratory and injunctive relief as well as damages under 42 U.S.C. § 1983.

After previously dismissing his claim for compensatory damages, the district court held a plenary hearing pursuant to Fed. R. Civ. P. 65(a)(2), consolidating the preliminary injunction hearing with a trial on the merits of his complaint.  At the conclusion of the hearing, the district court dismissed Bowman's complaint because it found the University to be a nonpublic forum and all the challenged restrictions on speech to be reasonable.

Bowman filed a timely notice of appeal pursuant to Fed. R. App. P. 4(a), thereby invoking  our jurisdiction over the appeal under 28 U.S.C. § 1291.  We review de novo the district court's conclusions of law.  Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002).  There are no material facts in dispute.

II.

"[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment."  Healy v. James, 408 U.S. 169, 180 (1972).  However, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983) (internal quotations omitted).  "The existence of a right of access to public property and the standard by which limitations upon such a right must

be evaluated differ depending on the character of the property at issue." Id. at 44. To this end, the Supreme Court uses a forum analysis for evaluating restrictions of speech on government property. See id. at 45-46. The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs., 111 F.3d 1408, 1418 (8th Cir. 1997). Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster. See, e.g., Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677-683 (1998) (hereinafter "Forbes"); United States v. Kokinda, 497 U.S. 720, 726-27 (1990). Thus, the extent to which access to, and the character of speech upon, government property may be limited depends upon the nature of the forum in which the speech takes place. Burnham v. Ianni, 119 F.3d 668, 675 (8th Cir. 1997).

A.    Traditional Public Forum

The government's ability to restrict speech is most circumscribed in a traditional public forum. Perry, 460 U.S. at 45 ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed."). A traditional public forum is a type of property that "has the physical characteristics of a public thoroughfare, . . . the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, [and] historical[ly] and traditional[ly] has been used for expressive conduct . . . ." Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir. 1999) (citations omitted). "'[P]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" United States v. Grace, 461 U.S. 171, 177 (1983).

A content-based restriction on speech within a traditional public forum must be necessary to serve a compelling government interest and be narrowly drawn to achieve that interest.  Perry, 460 U.S. at 45.  A restriction on speech that is not content-based and that restricts the time, place or manner in which speech may be communicated is subjected to a different, less restrictive standard.  Id.  The government may enforce a reasonable, content-neutral time, place and manner restriction in a traditional public forum if the restriction is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication.  Id.

B.    Designated Public Forum

A designated public forum is a nonpublic forum the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects.  Perry, 460 U.S. at 46.  "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse."  Forbes, 523 U.S. at 677 (internal quotations omitted) (alteration in original).

Despite this direction from the Supreme Court, our Circuit's analysis of what constitutes a "designated public forum," like our sister Circuits', is far from lucid. Substantial confusion exists regarding what distinction, if any, exists between a "designated public forum" and a "limited public forum."  See generally, Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 345-46 & nn.10-12 (5th Cir. 2001).  As the First Circuit pointed out in a footnote in Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 76 n.4 (1st Cir. 2004), "The phrase 'limited public forum' has been used in different ways.'"  The First Circuit accurately states that the phrase has been used as a synonym for the term "designated public forum" and also for the phrase "nonpublic forum." Id.  The Second Circuit has articulated the view that the phrases "designated public forum" and "limited public forum" are not synonyms.  See, e.g., N.Y. Magazine v.

Metro. Transp. Auth., 136 F.3d 123, 128 & n.2 (2d Cir. 1998) (describing a limited public forum as a "sub-category of the designated public forum, where the government 'opens a non-public forum but limits th expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" (quoting Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991))); see also Chiu, 260 F.3d at 346 n.12. A designated public forum can be classified as either "of a limited or unlimited character." Van Bergen v. Minnesota, 59 F.3d 1541, 1553 n.8 (8th Cir. 1995).

Under this analysis, a "limited public forum is a subset of the designated public forum [that] arises "'where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects."'" Make the Road By Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) (quoting Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 545 (2d Cir. 2002) (quoting N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 n.2 (2d Cir. 1998)). For example, a university concert hall might be considered a "limited public forum," designated for particular speech by university-supported musicians. An "unlimited" designated public forum is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker.

The distinction between a limited designated public forum and an unlimited designated public forum is significant because it controls the level of scrutiny given to restrictions on speech. Like the government's ability to restrict speech in a traditional public forum, the government's ability to restrict speech in an unlimited designated public forum is sharply circumscribed. Perry, 460 U.S. at 45. In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest. Perry, 460 U.S. at 46. In contrast, in a limited designated public forum, "[r]estrictions on

speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral." Turner, 378 F.3d at 143.

C.    Nonpublic Forum

The government can most freely restrict speech in a nonpublic forum. A nonpublic forum is government property which is not classified a traditional public forum or designated public forum. Warren, 196 F.3d at 192. In a nonpublic forum, the government may restrict speech "'as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose [a] speaker's view.'" American Civil Liberties Union of Nevada v. City of Las Vegas, 333 F.3d 1092, 1098 (9th Cir. 2003) (quoting Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 966 (9th Cir. 2002).

Accordingly, when analyzing how to classify a forum we must ask two questions. First, is the space a traditional public forum, a designated public forum, or a nonpublic forum? Second, if the space is a designated public forum, is the forum limited or unlimited in its character?

III.

The district court found that the campus of the University of Arkansas at Fayetteville is not a public forum. We disagree. The facts of this case show that the University's grounds cannot be labeled as only one type of forum and that the areas in question in this case are unlimited designated public fora.

A modern university contains a variety of fora. Its facilities may include private offices, classrooms, laboratories, academic medical centers, concert halls, large sports stadiums and arenas, and open spaces. The University of Arkansas at Fayetteville is this type of institution. Its open spaces, like those at most major universities, come

-10-

in a number of different types. Some are enclosed quadrangles bordered on all sides by university buildings and traversed by sidewalks, while others are grassy areas or plazas on the edge of campus where the University's grounds abut the city property. Thus, labeling the campus as one single type of forum is an impossible, futile task. See Justice for All v. Faulkner, 410 F.3d 760, 766 (5th Cir. 2005) (stating that "the Supreme Court's forum analysis jurisprudence does not require us to choose between the polar extremes of treating an entire university campus as a forum designated for all types of speech by all speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld"); see also Ala. Student Party v. Student Gov't Ass'n, 867 F.2d 1344, 1354 n.6 (11th Cir. 1989) (Tjoflat, J., dissenting) (stating that not all of a University campus is a public forum, but rather that a campus contains a variety of fora). Some places on the University's campus, such as the administration building, the president's office, or classrooms are not opened as fora for use by the student body or anyone else. As Bowman concedes, these areas are nonpublic fora. Other campus locations, such as auditoriums or stadiums allow for certain speech on certain topics. These locations may be described as designated public fora. Further, the public streets and sidewalks which surround the campus but are not on the campus likely constitute traditional public fora. Grace, 461 U.S. at 177. Accordingly, rather than attempt to label the entire campus as one type of forum, we will discuss only the specific areas at issue in this case.

Bowman desires to speak at various locations throughout the campus including the streets, sidewalks, and open areas located inside and directly adjacent to the campus. Specifically at issue in this case, Bowman desires to speak at the outdoor areas clearly within the boundaries of the campus known as the Union Mall,[3] the

---

[3] The Union Mall is located in the center of campus between the library and Union Mall facility. It is an outdoor area composed of grassy mounds surrounded by sidewalks and walkways, benches, and potted trees and plants. A bike rack, basketball hoop, fountain and street lamps appear in pictures depicting the area. The Union Mall hosts a variety of organized events such as political gatherings and musical events.

Peace Fountain[4] and Brough Commons,[5] presumably because of the high concentration of students in these locations.

The objective evidence in the record shows these particular areas combine the physical characteristics of streets, sidewalks, and parks, and are open for public passage. They do not include university buildings or stadiums, but they are located within the boundaries of the campus. The Union Mall and Peace Fountain are completely surrounded by University buildings. The physical characteristics of these spaces, "without more," might make them traditional public fora. Grace, 461 U.S. at 177; Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939) ("Wherever the titles of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."). However, "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." Grace, 461 U.S. at 177. Rather, the open nature of these spaces is merely a factor to consider in determining whether the government has opened its property. Grace, 461 U.S. at

---

Students use the Union Mall to sit on its benches and lay on its grass to read, study, and talk to one another.

[4] The Peace Fountain is located in the center of campus and hosts a variety of organized and unorganized events. The Peace Fountain is a metallic tower structure with a fountain of water at the base. A cemented area with potted trees and plants surrounds the fountain. Sidewalks run through and parallel to the Peace Fountain. A statue and small stone wall appear in pictures of the area.

[5] The Brough Commons building is an on-campus eating facility, but the area in question is outside the building at the intersection of Dickson Street and Ozark Street. Dickson Street runs from downtown Fayetteville and dead-ends in part of the campus. The area in question consists of a large sidewalk with some landscaping featuring trees and plants. The area also contains a historical marker memorializing the acquisition of the farmland on which the University sits.

177. We must also examine the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property, not merely its physical characteristics and location.[6] In particular, we must acknowledge the presence of any special characteristics regarding the environment in which those areas exist. See, e.g., Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506 (1969) (noting the "special characteristics of the school environment"); Greer v. Spock, 424 U.S. 828, 838-40 (1976) (discussing the unique nature of military bases and the fact that these circumstances must be taken into consideration).

In the case of the University, although it "possesses many of the characteristics of a public forum," such as open sidewalks, "[it] differs in significant respects from public forums such as streets or parks or even municipal theaters." Widmar v. Vincent, 454 U.S. 263, 268 n.5 (1981). A university's purpose, its traditional use, and the government's intent with respect to the property is quite different because a university's function is not to provide a forum for all persons to talk about all topics at all times. Rather, a university's mission is education and the search for knowledge – to serve as a "'special type of enclave' devoted to higher education." ACLU Student Chapter – Univ. of Md., College Park v. Mote, 321 F. Supp. 2d 670, 679 (D. Md. 2004) (quoting Grace, 461 U.S. at 180); see Widmar, 454 U.S. at 268 n.5 ("We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."). Thus, streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus.

The University argues that the areas at issue should be treated as nonpublic fora. This argument is contrary to how the University itself, through its policies and procedures, has treated the Union Mall, the Peace Fountain, and the Brough

---

[6] It must be noted that none of these factors are dispositive.

Commons.  The Policy, which permits speech by University and Non-University Entities, offers strong evidence that the University "intentionally open[ed]" areas of the campus "for public discourse."  Forbes, 523 U.S. at 677 (internal quotation omitted).  The Policy expressly states that it applies to "facilities or outdoor space . . . for use by University entities and Non-University entities."  Fayetteville Policies and Procedures, "Use of University Facilities and Outdoor Space" 708.0 (A).  The Policy governs the specific areas at issue here.  The only use of the space that is prohibited is any activity by private, for-profit businesses.  708.0 (A).  Further, the Policy indicates that the University has opened up the campus generally, not merely "to either a specific group of speakers or for discussion on a very narrow topic." Bourgault v. Yudof, 316 F. Supp. 2d 411, 420 (N.D. Tex. 2004).  The Policy provides strong evidence that the University, like many public colleges, has opened select portions of its campus "to facilitate discussion on issues of public concern."  Id.  As such, the Policy indicates that the University itself designated the areas in question as locations for free expression.

College campuses traditionally and historically serve as places specifically designated for the free exchange of ideas.  Healy, 408 U.S. at 180 (stating that universities represent a "marketplace of ideas").  The Supreme Court has advanced the idea that universities have traditionally opened parts of their campuses to speech.

> Th[e] danger [of chilling speech] is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition. . . . [U]niversities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn.  The quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment.

Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 835-36 (1995) (citations omitted).  Indeed, in times of great national discussion, such as during the

height of the Vietnam War or the debate over the war in Iraq, college campuses serve as a stage for societal debate. Often those speaking on college campuses are not enrolled students, but rather people like Bowman, who travel from campus to campus to spread their message. Thus, public university campuses historically contain places where space is specifically designated by society and universities themselves for speech.

This tradition of free expression within specific parts of universities, the University's practice of permitting speech at these locations, and the University's past practice of permitting both University Entities and Non-University Entities to speak at these locations on campus demonstrate that the University deliberately fosters an environment that permits speech "subject to the limits necessary to preserve the academic mission and to maintain order." Hays County Guardian v. Supple, 969 F.2d 111, 117 (5th Cir. 1992) (finding certain outdoor areas of a university to be a designated public forum, designated for the speech of students). Accordingly, we hold that the specific property at issue – the Union Mall, Peace Fountain, and Brough Commons – are designated public fora. This holding does not apply to any other areas on the University campus, about which we express no opinion.

We must next decide whether the forum is limited or unlimited in its character. In this case, although the University gives preferential treatment to University Entities over Non-University Entities in regard to use of University space, there is little evidence that the University intended to limit the use of University space to a particular type of speech or speaker. Accordingly, we hold that the spaces at issue are unlimited designated public fora.

IV.

Having concluded that the outdoor areas in question are unlimited designated public fora, we must ascertain whether the Policy impermissibly restrains free expression. We analyze the University's time, place, and manner restrictions using the appropriate scrutiny standard, which requires a restriction on speech to be content-neutral and narrowly tailored to serve a significant government interest. Perry, 460 U.S. at 45.

There is no evidence that the Policy is anything but content neutral. Our analysis, therefore, focuses on whether the Policy is narrowly tailored to serve a significant government interest. The University has identified a number of interests that justify a restriction on speech. One significant interest is protecting the educational experience of the students in furtherance of the University's educational mission.[7] This interest is significant because an educated electorate is essential to the vitality of our democracy and a lack of proper education diminishes the value of our free speech rights. See Keyishian v. Bd. of Regents of the Univ. of the State of N.Y., 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas . . . ."). A second significant interest is in ensuring public safety. Like education, safety is a fundamental human need without which the desire to speak one's mind becomes moot. See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) ("As a general matter it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."). Finally, a third significant interest asserted by the University is the fostering of a diversity of uses of University resources.

---

[7] This interest includes the University's interest in preserving University Entities' priority for the space in furtherance of that mission.

A regulation is narrowly tailored when it furthers a significant government interest that would be achieved less effectively without the regulation. Thorburn v. Austin, 231 F.3d 1114, 1120 (8th Cir. 2000). The statute does not, however, need to be the least restrictive means of regulation possible. Id. Accordingly, we next analyze whether each of the time, place and manner restrictions imposed by the University are sufficiently narrowly tailored to meet one or more of the significant government interests described above.

A. Permit Requirement

The University's requirement that a Non-University Entity obtain a permit before "using" outdoor space is a prior restraint on speech against which there is a heavy presumption of unconstitutionality. Forsyth County v. The Nationalist Movement, 505 U.S. 123, 130 (1992). The government "may impose a permit requirement on those wishing to hold a . . . rally." Id. This permit may only be imposed, however, if it does not delegate overly broad licensing discretion to a government official, is content-neutral, is narrowly tailored to the University's significant governmental interests, and leaves ample alternative channels for communication. Id.

The University's policy does not delegate overly broad discretion to its officials, nor does it allow the denial or revocation of permits on the basis of content. The Policy applies to all not-for-profit Non-University Entities.[8] The Policy grants the University the right to deny or revoke a permit for the use of a space by a Non-University Entity only for limited reasons, such as interference with the educational activities of the institution.

---

[8] The Policy gives the University broad discretion to deny permits to for-profit entities.

The University has a significant public safety interest in requiring a permit because of the time and resources necessary to accommodate the crowds that Bowman attracts. See Thomas v. Chicago Park Dist., 534 U.S. 316, 322 (2002) (upholding a requirement that individuals obtain a permit before conducting events in public parks involving fifty or more people); see also Grossman v. City of Portland, 33 F.3d 1200, 1206 (9th Cir. 1994) ("Some type of permit requirement *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial."). Bowman argues that the Thomas and Grossman analyses are not applicable to him because he is a single speaker. This argument fails because regardless of whether Bowman is speaking alone or with others, carrying a sign, or handing out literature, he has demonstrated the capacity to attract a crowd and disrupt the unique educational environment. See Mote, 321 F. Supp. 2d at 679. In fact, the majority of Bowman's space reservation requests listed an estimated attendance of between fifty and one hundred people, analogous to the situation in Thomas. The actual attendance at his events has run as high as two hundred people. Under these circumstances, the permit requirement is justified to "coordinate multiple uses of limited space," "assure preservation of the [campus]," "prevent uses that are dangerous" to students or other people, and "to assure financial accountability for damage" caused by Bowman's event. Thomas, 534 U.S. at 322.

The University's permit requirement is narrowly tailored to meet these significant interests. The University's requirement that Non-University Entities notify the University in advance of their intent to use its facilities does not burden substantially more speech than is necessary to further the University's interests. These interests include ensuring public safety, minimizing the disruption of the educational setting, and coordinating the use of limited space by multiple entities. Further, the University's requirement leaves open ample alternative channels for communication. Accordingly, although the Policy admittedly does burden Bowman's speech by

requiring him to plan sufficiently in advance to obtain a permit, it is not overly burdensome so as to make the permit requirement unconstitutional.

B. Five-Day Cap

In addition to the permit requirement, the University regulates the time in which a speaker may speak by imposing a cap of five, eight-hour days per semester. If a speaker requests a sixth day, the University will deny the permit. The University explains that the five-day cap allows the speaker, on a semester basis, the same number of access hours as expended on a typical three-semester-hour class. The University argues that the five-day cap fosters a diversity of usage, prevents monopolization of space and preserves the property's tax-exempt status.

The University's interest in fostering a diversity of viewpoints and avoiding the monopolization of space serves a significant interest. However, the five-day cap is not sufficiently narrowly drawn to achieve that interest. The Policy as written does not by itself foster more viewpoints; it merely limits Bowman's speech. If no one else wants to use the space after Bowman has used his five permits, the space will go unused even if Bowman still wants to use the space. A more narrowly tailored policy might grant Bowman more than just five days per semester to speak if the space is not being used, but give preference to other speakers who have not already obtained five permits. Furthermore, a policy that allows speakers to obtain permits for a limited number of events at any one time might be permissible to further the significant interest of keeping spaces open for an array of groups and a diversity of uses. This type of policy would further the University's interest in preventing a single entity from monopolizing a specific space by reserving that space for an entire semester with a single permit request.

Although the five-day cap might increase the odds that the space will be available for informal use, this rationale is not a sufficient justification in light of the

disfavor with which restrictions on speech are viewed. The University's limitation is not narrowly tailored to achieve its interest in fostering a diversity of viewpoints and avoiding monopolization of space. Accordingly, we conclude that the five-day cap is an unnecessary abridgment of Bowman's speech rights, and therefore unconstitutional.

C. Three-Day Notice Requirement

The University requires three-days' advance notice. Bowman argues that the advance notice requirement effectively bars him from engaging in constitutionally protected spontaneous speech. The University asserts that the notice requirement is necessary to allow it to plan for exigencies such as crowd control and insurance requirements. This court stated in Douglas v. Brownell, 88 F.3d 1511, 1523-24 (8th Cir. 1996), that a five-day advance notice requirement for a permit was not narrowly tailored. We noted, however, that advance notice requirements of three days or fewer have been upheld by courts as sufficiently narrowly tailored. Id. at 1523. The case at bar is distinguishable from Douglas in at least two ways. First, the notice requirement is only three days. Second, a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice. Mote, 321 F. Supp. 2d at 681 ("a University's resources are limited and the University has an interest in reserving those resources for University community members"); see also Glover v. Cole, 762 F.2d 1197, 1203 (4th Cir. 1985) ("[a] college has a right to preserve the campus for its intended purpose and to protect college students from the pressures of solicitation"). In light of the modest nature of the requirement and what the district court described as the University's reduced capacity to address "the exigencies of determining what, if any, security, crowd control, additional insurance, etc., will be required for a particular event," we conclude that the advance notice requirement is sufficiently narrowly tailored, and thus permissible.

D. Dead Day Ban

The University bans Non-University Entities from using its space during so-called "dead days."  The University explains that "dead days" are the official final examination periods, which allow students to study for and take final exams in a peaceful, quiet environment, and the dates of official University commencement activities. Protecting the educational experience of the students by preserving limited quiet study and exam-taking time is a significant government interest. The University has shown that Bowman's activities such as preaching, passing out literature, or carrying a sign could very easily interfere with a student's educational experience by causing a noise disturbance.  For example, carrying a sign, though silent as an action, might provoke noisy, disruptive confrontations.

Bowman argues that the dead day ban is underinclusive because it leaves a substantial amount of seemingly intrusive conduct unregulated, in that it allows speech by University Entities, which could be just as intrusive as speech by Non-University Entities. See City of Ladue v. Gilleo, 512 U.S. 43, 52-53 (1994) (stating that exceptions to a regulation of speech may diminish government's credibility in justifying its regulation).  This underinclusivity, however, does not necessarily undermine the credibility of the university's rationale for limiting access during examination and commencement periods. The underinclusive regulation of speech in Ladue was a "red flag" that rendered "implausible the government's claim that the regulation . . . [wa]s narrowly tailored," National Federation of the Blind v. Federal Trade Commision, 420 F.3d 331, 345-46 (4th Cir. 2005), but a limitation on speech that is not all-encompassing may still be narrowly tailored where the underinclusivity does not favor a particular viewpoint or undermine the rationale given for the regulation. Id.; Children of the Rosary v. City of Phoenix, 154 F.3d 972, 982 (9th Cir. 1998); ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 957-58 (D.C. Cir. 1995).

Here, the university reasonably justified a modification of its unlimited designated forum during discrete times of the academic year when an abundance of speakers would be likely to interfere with the educational mission. During these periods, the university restricts not only outside speakers like Bowman, but also university-related activities (such as athletic contests and work on the physical plant) that have a potential to hinder students in their preparation for examinations. (Appellant's App. at 290-91). We think it was reasonable for the administration to conclude that University Entities who do reserve space in the designated forums on these dates are more likely to be attuned to the special needs of the university community during examination and commencement periods (see id. at 341), and thus less likely to disrupt the campus during these sensitive times. In effect, the university has elected to limit the designated forums to certain classes of speakers during these narrow windows in the academic year, and it is well established that the government is not required "to indefinitely retain the unlimited open character of" a designated public forum. Perry, 460 U.S. at 46. Accordingly, we conclude that the dead day ban passes constitutional muster.

## V.

For the foregoing reasons, we conclude that the University's permit requirement, notice requirement, and dead day ban are constitutional, but that the five-day cap is insufficiently narrowly tailored to survive. Accordingly, we affirm in part and reverse in part.

BYE, Circuit Judge, concurring,

While I agree with the Court as to the ultimate outcome of this case, I write separately because the Union Mall, Peace Fountain, and Brough Commons should be recognized as traditional public fora.

The most important analysis we undertake in a First Amendment case is the forum analysis. As the Court recognizes, the forum analysis dictates the level of scrutiny we apply in First Amendment cases. See Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677-83 (1998). While the Court does an excellent job of wading through the muddy waters of First Amendment forum analysis jurisprudence, like so many courts, it fails to plant the seeds of its discourse in the marshes at issue here. I cannot adopt the Court's view as to public areas on a public university campus not being traditional public fora but instead designated public fora which the University can redesignate to a non-public forum on a whim.

I

The Court employs the now-standard definition of a traditional public forum: property owned or controlled by the government which (1) has the physical characteristics of a public thoroughfare, (2) was created with the purpose of open public access or for a purpose inherently compatible with expressive conduct,[9] and (3)

---

[9] While the purpose for which a space was created is important to determine whether a traditional public forum exists, government intent is not otherwise relevant to a determination of whether a space is a traditional public forum. See Am. Civil Liberties Union of Nev. v. City of Las Vegas, 333 F.3d 1092, 1104 & n.11 (9th Cir. 2003). Even under a broader intent analysis, however, the University's historical use of the spaces for expressive purposes suggests the areas were intended to be traditional

has traditionally been used for expressive conduct. Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir. 1999). Streets, sidewalks and parks are the quintessential traditional public fora. See ante at 12 (citing United States v. Grace, 461 U.S. 171, 177 (1983); Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939)); see also Am. Civil Liberties Union of Nev. v. City of Las Vegas, 333 F.3d 1092, 1099 (9th Cir. 2003). Indeed, "public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." Ante at 7 (quoting Grace, 461 U.S. at 177) (internal quotations omitted); see also Hague, 307 U.S. at 515 ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."). However, the Court's analysis fails to give any weight to the precedent it cites.

The Court acknowledges the areas in dispute–the Union Mall, Peace Fountain, and Brough Commons–have the "physical characteristics of streets, sidewalks, and parks, and are open for public passage." Ante at 12. The Court even goes so far as to note "[t]he physical characteristics of these spaces, 'without more,' might make them traditional public fora." Id. Of course, the physical characteristics of a space are not the only factors to consider in a traditional public forum analysis. The purpose for which the space was created and the traditional use of the space must also be considered. See Warren, 196 F.3d at 191. In analyzing the other factors, the Court missteps. It gives undue weight to largely irrelevant factors, insufficiently analyzes others, and fails to contextualize its analysis to the University of Arkansas spaces at issue.

---

public fora. See Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir. 1991) ("Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity.").

The Court, relying upon dicta in a case dealing with spaces on the University of Maryland campus, claims a public university's mission is "not to provide a forum for all persons to talk about all topics at all times," but rather to serve as an enclave for higher education. Ante at 13. The Court next ascribes this mission to the University of Arkansas without analyzing its varied missions or how they relate to determining the existence of a traditional public forum.[10] See ACLU of Nevada, 333 F.3d at 1104 & n.11 (noting government intent is not relevant to a traditional public forum analysis). Despite its contention no factor is dispositive, see ante at 12 n.6, the Court essentially concludes this mission is sufficient to outweigh all other factors.

The Court's analysis, however, does not comport with Supreme Court precedent. The issue is not whether the mission of the University as a whole is to provide full access to everyone on all topics, but whether the University created the spaces for public access and a purpose not incompatible with expressive conduct and such spaces have historically been used for expressive conduct. The University's overall mission is irrelevant to a proper First Amendment forum analysis.

Should the University's mission be relevant, it would not be dispositive of whether a space is a traditional public forum. "The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 547 (2d Cir. 2002) (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth., 691 F.2d 155, 160 (3d Cir. 1982)); see also Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 693 (1992) (Kennedy, J., concurring) ("If our public forum jurisprudence is to retain vitality, we must recognize

---

[10] One of the University of Arkansas's purposes in enacting the Policy is the promotion of viewpoint diversity.

that certain objective characteristics of Government property and its customary use by the public may control.") (quoting United States v. Kokinda, 497 U.S. 720, 737 (1990) (Kennedy, J., concurring)).

The Court's analysis gives rather short shrift to another significant factor in the traditional public forum analysis: whether the space was created for a purpose incompatible with expressive conduct. The Court does not suggest how expressive conduct, occurring in the Union Mall, Peace Fountain, or Brough Commons is "basically incompatible" with a mission of promoting higher education. See Greer v. Spock, 424 U.S. 828, 843 (1976). Indeed, courts have consistently held expressive conduct is compatible with a purpose of promoting education. See, e.g., Keyishian v. Bd. of Regents of the Univ. of N.Y., 385 U.S. 589, 603 (1967) (noting the purpose of public universities is to expose students to a "marketplace of ideas"); Bd. of Regents of the Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 237 (2000) ("[R]ecognition must be given as well to the important and substantial purposes of the University, which seeks to facilitate a wide range of speech."); Peck v. Upshur County Bd. of Educ., 155 F.3d 274, 279 (4th Cir. 1998) (affirming the district court finding the express purpose of a primary school board's practice of allowing private speakers access to the public schools was to promote "a broad spectrum of knowledge"); N.J. Sports & Exposition Auth., 691 F.2d at 160 ("[T]he exchange of ideas is an essential part of the educational process . . . ."); Glover v. Cole, 762 F.2d 1197, 1200 (4th Cir. 1985) ("A college milieu is the quintessential 'marketplace of ideas.'").

In analyzing the particular spaces, it is undisputed the Union Mall, Peace Fountain, and Brough Commons are public thoroughfares open to public access. It is also undisputed these areas are used and have historically been so for expressive and non-expressive activities by both University and Non-University Entities. The Court's analysis discounts such significant factors in favor of a lesser one--the University's mission--which is largely irrelevant to a traditional public forum analysis.

-26-

II

The authority upon which the Court relies does not support the view streets, sidewalks, and parks on a public university are not traditional public fora. In fact, the Court's position is tenuous at best. See Healy v. James, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged order, First Amendment protections should apply with less force on college campuses than in the community at large."). The only appellate case the Court cites arguably on point is Hays County Guardian v. Supple, 969 F.2d 111, 118 (5th Cir. 1992), which held sidewalks and plazas to be designated public fora for the speech of university students. The analysis in Hays, however, follows the test for determining whether a space is a traditional public forum. See id. at 117 (noting Southwest Texas State University's regulations permit "[a]ny group or person, whether or not a student or employee, and whether or not invited by a registered student, faculty, or staff organization, may assemble and engage in free speech activities on the grounds of the campus"). In analyzing the spaces, however, the Fifth Circuit never addressed the traditional uses of the sidewalks and plazas or whether they might be considered traditional public fora. Accordingly, Hays does not stand for the proposition outdoor sidewalks and plazas on University property are not traditional public fora; it only stands for the proposition they are at least designated public fora.

The other cases to which the Court cites are clearly distinguishable as they relate to: (1) public high schools, which have not been traditionally held open to expressive conduct, Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506 (1969); see also Southworth, 529 U.S. at 237 (Souter, J., concurring) ("[Our] cases dealing with the right of teaching institutions to limit expressive freedom of students have been confined to high schools, whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college

education.") (internal citations omitted), and which face unique and significant discipline concerns, <u>N.J. Sports & Exposition Auth.</u>, 691 F.2d at 160 ("Since the exchange of ideas is an essential part of the educational process, but the need for discipline and order is great, a public high school is probably a limited forum also."); and (2) military bases which have not been historically held open as a public thoroughfare or for expressive conduct, <u>Greer</u>, 424 U.S. at 838.

The Court also relies upon dicta found in a footnote in <u>Widmar v. Vincent</u>, 454 U.S. 263, 268 n.5 (1981) ("We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."), for the proposition streets, sidewalks, and parks found within public universities are not traditional public fora. This reading is not supported by the footnote. The footnote begins, "[t]his Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." <u>Id.</u> (internal citation omitted). The footnote goes on to limit this generality when applied to college classrooms. For this limitation, the Court relies upon cases dealing with public high schools, which, as noted above, are readily distinguishable from college campuses. The Court in no way suggests, and perhaps with its use of the term "all" implies the contrary, all streets, sidewalks, and parks on a public university are non-traditional public fora.

Indeed, the Court's reading is in tension with its position a public university campus contains a variety of fora. See <u>Justice for All v. Faulkner</u>, 410 F.3d 760, 766 (5th Cir. 2005); <u>Ala. Student Party v. Student Gov't Ass'n</u>, 867 F.2d 1344, 1354 n.6 (11th Cir. 1989) (Tjoflat, J., dissenting). If a public university contains a space which is properly considered a traditional public forum, which it almost certainly does, I cannot think of a more appropriate traditional public forum than a street, sidewalk, or park. For this reason, I disagree with <u>Am. Civil Liberties Union v. Mote</u>, 423 F.3d

438, 433-34 (4th Cir. 2005) (holding because the campus is an institution of higher learning, its outdoor areas are not held open to the general public). <u>Mote</u> stands for the proposition the campus as a whole, including classrooms, facilities, and buildings, must be open to the entire public for the outdoor areas to constitute a traditional public forum, even when the public has unfettered access to such outdoor areas.   I emphatically disagree with <u>Mote</u> for the reasons described in this concurrence. <u>See</u> <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 267 (1988) ("[High] school facilities "may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public.") (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 47 (1983)); <u>see also</u> <u>Faulkner</u>, 410 F.3d at 766 (noting a public university campus may contain a variety of fora); <u>Ala. Student Party</u>, 867 F.2d at 1354 n.6 (same).


## III


The Court does acknowledge public universities and colleges have been historically and traditionally used for expressive purposes by students and non-students alike.  The Court considers the outdoor areas on the University of Arkansas campus to be unlimited designated public fora, presumably to ensure student and non-student speech is protected to the level we associate with public universities. However, although the Court's designation requires the application of the same level of scrutiny of regulations limiting speech as does a traditional public forum designation, <u>see, e.g.</u>, <u>Goulart v. Meadows</u>, 345 F.3d 239, 250 (4th Cir. 2003), the Court's designation does not effectively serve to protect either student or non-student speech.


Once a space is deemed something other than a traditional public forum, even if an unlimited designated public forum, the government is free to redesignate the space to limit further expressive conduct or to prohibit it completely. <u>See, e.g.</u>, <u>Lee</u>,

505 U.S. at 700 (Kennedy, J., concurring); <u>Perry</u>, 460 U.S. at 46 (declaring a governmental entity is not required to retain indefinitely the open character of a designated public forum); <u>Chicago Acorn v. Metro. Pier & Exposition Auth.</u>, 150 F.3d 695, 699-700 (7th Cir. 1998). This is a concept inconsistent with our basic understandings of a public university. <u>See</u> <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 835-36 (1995) (discussing the historical use of universities as "voluntary and spontaneous assemblages or concourses for students to speak").

To safeguard a public university street, sidewalk, or park's role as a place for students to assemble and speak, these areas must be considered the type of property which would fall within the traditional public forum category. Whether a particular public university street, sidewalk, or park is a traditional public forum will depend upon the purpose for which it was created and its traditional use. However, there is no forum more appropriately considered a "marketplace of ideas" and historically used by all members of the public to present both socially acceptable and unacceptable speech than a street, sidewalk, or park found on a public university campus.

Indeed, there is no reason students who may or may not pay tuition and who may or may not live on campus should have more expressive rights upon a campus street than should non-students who directly support the public university with tax dollars. The non-student public attends civic, sporting, theater, and other events on public university campuses. In this sense, a public university belongs just as much to a community as it does to the students. Nor is a public university's educational mission limited to its students–a university and its faculty publish books to benefit the public good and use public tax dollars to conduct important research. If we are to protect any space as a traditional public forum for expressive purposes, a public university street, sidewalk, or park must be such a space.

Wherever a public street or sidewalk runs, it is presumed to be a traditional public forum. Frisby v. Schultz, 487 U.S. 474, 480 (1988). There is, therefore, no reason to apply a different level of scrutiny to a street, sidewalk or park which happens to fall within the boundaries of a public university than to one owned by a municipality. The location of the street "may well inform the application of the relevant test, but it does not lead to a different test." Id.; see also Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.") (internal quotation omitted). The University of Arkansas allows indiscriminate expressive use by all members of the public at the Union Mall, Peace Fountain, and Brough Commons, regulated only by narrowly tailored time, place, and manner restrictions designed to serve significant government interests. While the university context may allow greater and different types of time, place, and manner regulations, those regulations do not change the character of the space as a traditional public forum.


IV


The Court wholly fails to acknowledge the University did not formally regulate expressive conduct on its public thoroughfares until it enacted the Policy in 1993. Because the University now chooses to regulate speech, however, may not be sufficient to overcome the objective indicia of contrary purpose. See Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir. 1991).


-31-

It is unclear from the record whether the spaces at issue in the instant case were designated when the University was founded in 1871 or were created sometime thereafter. If created at the time the University was founded or prior to the enactment of the Policy, this might suggest the University designated the spaces for a purpose inherently compatible with expressive conduct. See Rosenberger, 515 U.S. at 835-36 ("[U]niversities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn."); Mote, 423 F.3d at 433-34 ("There is nothing in the record to indicate that until the policy at issue here was implemented, the campus was anything but a non-public forum for members of the public not associated with the university."). If created after the enactment of the Policy, it is possible the University intended a purpose not inherently compatible with expressive conduct. However, the record is conspicuously silent on this issue and, indeed, why the spaces were designated as such in the first instance.

The Court, however, does acknowledge the spaces at issue have historically and traditionally been used by University and Non-University Entities.[11] The Court further recognizes "college campuses traditionally and historically serve as places specifically designated for the free exchange of ideas." Ante at 14. Indeed, the Court recognizes a historical and traditional use of public universities and colleges by non-students and students alike is to discuss issues of public significance during times of turmoil. The Court, however, does not suggest where this speech historically or traditionally occurred on the campuses.

I am left with uncertainty when the spaces were designated and why—factors of significant importance in determining whether the spaces were created for purposes

---

[11] While the Court uses its analysis of the historical and traditional use of the spaces to determine whether the spaces are designated public fora or non-public fora, the same analysis applies equally to determine whether the spaces are traditional public fora or non-traditional public fora.

inherently compatible with expressive conduct.  In spite of the Court's valiant effort to use generalization to establish the historical and traditional use of the Union Mall, Peace Fountain, and Brough Commons, the record remains insufficient to determine whether the spaces are traditional public fora under our adopted precedent.

However, the absence of a record should not necessarily preclude us from reaching a conclusion on the merits of a case.  Grace is instructive: "'[p]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" 461 U.S. at 177.  This view is buttressed by Frisby, which states, "[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora."  Frisby, 487 U.S. at 481; see also Kokinda, 497 U.S. at 744 n.2 (Brennan, J., dissenting) ("[W]hen citizens are going about their business in a place they are entitled to be, they are presumptively entitled to speak.").

While Frisby does not stand for the proposition every sidewalk, street or park located on government property is a public forum, it does suggest a heavy burden to prove otherwise.  Frisby, read in light of Grace and Kokinda, suggest there is a presumption of public streets, sidewalks, and plazas being associated with expressive conduct, wherever they are located, are presumed to be traditional public fora, unless proved otherwise.  While other spaces may constitute traditional public fora, see ACLU of Nev., 333 F.3d at 1099 n.6, these are the spaces the case law presumes to be traditional public fora.

Given the sparse record in the instant case, it is incumbent upon us to determine a framework for proving whether a particular space is a traditional public forum.  Given the presumption established by Grace and Frisby, we should permit a prima facie showing of a traditional public forum to be made when a plaintiff establishes the

-33-

space at issue is a public street, sidewalk, or plaza associated with expressive activity. Here, Mr. Bowman has clearly done so.

When a plaintiff makes a prima facie showing a space is a traditional public forum, the defendant should bear the burden to produce objective evidence of the (1) physical characteristics, (2) original purpose, or (3) historical and traditional use of the space which would rebut plaintiff's prima facie showing.

Here, the University failed to produce evidence which would establish anything other than a traditional public forum regarding the purposes for which the Union Mall, Peace Fountain, and Brough Commons were created or regarding the historical and traditional uses of those spaces.[12] Accordingly, I would conclude the University failed to meet its burden to produce evidence sufficient to rebut Bowman's prima facie showing the spaces at issue are traditional public fora.[13] Nevertheless, this does not

---

[12] That the University has restricted speech for over a decade does not establish that those restrictions comport with the greater history of the spaces or their inherent compatibility with expressive purposes. Indeed, although a University may attempt to change the character of a traditional public forum, it can only do so legitimately by changing the physical characteristics of the space–it may not do so by fiat. See Lee, 505 U.S. at 700 (Kennedy, J., concurring); Kokinda, 497 U.S. at 743 (Brennan, J., dissenting) ("Public access is not a matter of grace by government officials but rather inherent in the open nature of the locations.").

[13] The Court fails to analyze the differences between the three areas, including those related to public perception, which might counsel a different outcome for the Brough Commons than the Union Mall or the Peace Fountain. Brough Commons is unique even among the other two public places because it is located at the intersection of two public streets and is not separated from the city sidewalks and public thoroughfares by a fence or other clear demarcation. The record establishes a passerby would not know she had entered a "special enclave" with reduced protections for expressive conduct once she passed onto the Brough Commons area. See Grace, 461 U.S. at 179-80; Initiative and Referendum Inst. v. United States Postal

-34-

end the inquiry. A determination must still be made whether the regulations comport with the standard of scrutiny applied to regulation of traditional public fora.

V

Although I disagree with the Court's forum analysis and failure to place appropriately the burden of rebuttal on the University, I agree with the ultimate disposition of this case because the advance notice and permit requirements, as well as the dead day restrictions, imposed by the University pass constitutional muster under the traditional public forum analysis, while the five day limitation does not.[14] See Grayned, 408 U.S. at 118-19 (noting the city can restrict the public's expressive activity on public sidewalks adjacent to a school if the conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others").

Although the Court's reasoning as to Bowman's proposed leafletting and silent speech activities comes close to upholding improper prohibitions on speech based upon a feared reaction, see Tinker, 393 U.S. at 508-09; PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1206 (10th Cir. 2002) (citing Cox v. Louisiana, 379 U.S. 559, 560 (1965)), given the University's limited resources,

---

Serv., 417 F.3d 1299, 1313-14 (D.C. Cir. 2005). Under the case law which speaks directly to this issue, Brough Commons is a traditional public forum.

[14] Although the same scrutiny is applied in cases involving traditional public fora and designated public fora, see, e.g., Goulart, 345 F.3d at 250, I disagree with the Court's implicit suggestion there is a lessened burden for designated public fora because the University may simply redesignate the space at issue. While the University may redesignate the space if the space is deemed a designated public forum, such a redesignation cannot serve to avoid review under the designated public forum standard, nor can it be applied as a post hoc rationalization for an unconstitutional restriction of expressive conduct.

-35-

the advance notice and permit regulations nevertheless serve significant governmental interests in protecting University Entities against unwanted solicitation and ensuring proper crowd control capabilities, while being narrowly tailored to those interests. See Glover, 762 F.2d at 1201-03 (concluding solicitation restriction is a "manner" restriction which passes constitutional muster).

Similarly, the dead day ban is a time restriction which serves a significant government interest in ensuring proper studying and testing conditions and is narrowly tailored to those interests.[15] See PeTA, 298 F.3d at 1204-05.

_____

[15] Bowman has raised concerns regarding the distinction between University and Non-University Entities' speech on dead days. I disagree with the Court's treatment of this argument insofar as the limitations on athletic contests and plant maintenance are highly distinguishable. Maintenance work is not a protected expressive activity. Limitations on athletic contests do limit speech, but it is unclear from our precedent whether such speech is actually deemed protected speech. In any event, the spaces in which the contests occur might not be considered either traditional public fora or unlimited designated public fora and the limitations imposed restrict both student and non-student speech. I further question the Court's speculation University Entities's expressive activities, which may include speech by individuals not associated with education, are more attuned to the needs of the University for quiet during the dead days than the public. Nevertheless, the differential treatment raised by Bowman does not serve to make the regulation improper under a traditional public forum analysis because it serves significant government interests and is narrowly tailored to those interests since it minimizes the distractions faced by students during exam period and leaves open ample other times during which expressive activities may occur. Further, such claims are more properly raised under the Equal Protection Clause than under the First Amendment. See Kokinda, 497 U.S. at 733.

Based on such reasoning as to the nature and status of the Union Mall, Peace Fountain, and Brough Commons, which, I believe, should be recognized as traditional public fora, I do, nonetheless, concur in the ultimate outcome of this case.

_____